IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 19-61 |
| | ) | |
| MICHAEL MORAN | ) | |

**SENTENCING MEMORANDUM**


I. INTRODUCTION ..... 1

II. APPLICABLE LEGAL STANDARDS ..... 2

a. Generally ..... 2

b. Variances ..... 3

III. APPLICATION OF SECTION 3553(a) FACTORS ..... 5

a. Mr. Moran's History and Characteristics ..... 6

i. Childhood Abandonment, Upheaval and Sexual Abuse ..... 6

ii. Adult life and employment ..... 7

b. Nature and Circumstances of the Offense ..... 8

c. Sentencing Guidelines ..... 8

i. Technical Calculation ..... 8

ii. The child pornography guideline is not the product of empirical research and should be afforded less deference ..... 9

iii. Enhancements for use of computer and number of images constitute double counting ..... 11

iv. Enhancements under section 2G2.2 are fundamentally punitive in nature and do not reflect relative culpability ..... 13

v. Mr. Moran's offense score is flawed and does not reflect his relative culpability ..... 17

IV. MR. MORAN SHOULD RECEIVE A VARIANCE BECAUSE OF THE CLOSE RELATIONSHIP BETWEEN HIS CHILDHOOD ABUSE AND HIS OFFENSE CONDUCT ..... 18

V. MR. MORAN SHOULD RECEIVE A VARIANCE BECAUSE OF HIS AGE AND HEALTH ..... 19

VI. MR. MORAN SHOULD RECEIVE A DOWNWARD VARIANCE BASED ON THE UNUSUALLY HARSH CONDITIONS OF HIS PRETRIAL CONFINEMENT ..... 23

VII. CONCLUSION ..... 23

## I. INTRODUCTION

Michael Moran is 66 years old. He suffers from high blood pressure and high cholesterol, he is overweight and approaching obesity, and he lost most of his teeth following dental surgery in September 2022. After being sexually abused by his mother and a neighbor on separate instances before adolescence, his mother abandoned him at age 11 and he was forced to bounce between the homes of various aunts, uncles, and a foster care placement. At age 19, after his aunt passed away, he got his own place and has lived alone ever since. He committed himself to a long career as a janitor and clerk at Rite Aid, and further isolated himself from the world around him. Prior to the investigation in this case, he was never charged with a criminal offense. Since the charges in this case, he has spent the last 5.5 years in custody, including through the entirety of the COVID-19 pandemic. Mr. Moran comes to this Court humbled and prepared to receive its judgment in this case.

Mr. Moran's advisory Guideline range is 151 to 188 months. This is because Congress mandated that the Sentencing Commission act to create and proliferate a Guideline that is divorced from a defendant's relative culpability, and which enhances a defendant's sentence based on factors that are ubiquitous in child pornography cases. Section 2G2.2 violates the mandate in Section 3553(a) that a court sentence a defendant based on the nature and circumstances of the offense and the history and characteristic of the defendant. Since the advisory Guideline range applicable in this case is not based on empirical research and national experience, and because several of the enhancements lead to impermissible double

counting for the same conduct, this Court should give little deference to the advisory Guideline range as calculated by the Probation Office.

Accordingly, the Court should reduce his offense score by 4 levels. His new advisory Guideline range should be calculated as 97 to 121 months. Furthermore, the Court should vary downward 2 additional levels from the re-calculated advisory Guideline range for several reasons: (1) because of the close relationship between his childhood sexual abuse and his offense conduct in this case; (2) because his age and health; and (3) the unusually harsh conditions of pretrial confinement due to the COVID-19 pandemic. Accordingly, a sentence within the recalculated range of 78 to 97 months, followed by an extended term of supervised release, will be sufficient but not greater than necessary to comply with the purposes of sentencing in this particular case.

## II. <u>APPLICABLE LEGAL STANDARDS</u>

### a. <u>Generally</u>

This Court has "broad discretion" in imposing a sentence. *United States v. Booker*, 543 U.S. 220, 233 (2005). While the Court must consider the United States Sentencing Guidelines ("Guidelines") when fashioning a sentence, it may not presume that a sentence within the advisory Guideline range is appropriate. *Gall v. United States*, 552 U.S. 38, 50 (2007). In that sense, the Guidelines are merely a "starting point" for a court's consideration of an appropriate sentence. *Id.* at 49. As this case relates to a child pornography offense, the Court should make special effort to not be "so appalled by the offense that it los[es] sight of the offender."

*United States v. Olhovsky*, 562 F.3d 530, 549 (3d Cir. 2009). When imposing a sentence, the Court must ensure that it is "sufficient, but not greater than necessary" to achieve the goals of sentencing, with particular attention paid to the defendant's "history and characteristics." 18 U.S.C. § 3553(a), (a)(1).

**b. Variances**

A sentencing court must consider the relevant Section 3553(a) factors in determining the appropriate sentence. *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). Even if a court finds that a particular circumstance does not warrant a formal departure under the Guidelines, those same facts may nevertheless support a valid basis for a variance below the advisory Guideline range. *See United States v. Vazquez-Lebron*, 582 F.3d 443, 447 (3d Cir. 2009) (finding that district court's consideration of same factors for departure and variance is appropriate).

Childhood trauma, to the extent it is relevant to the offense conduct and application of the Guidelines, may be considered by the Court at sentencing. *United States v. Barbour*, 66 Fed. App'x 327, 329 (3d Cir. 2003) (recognizing authority that a downward departure "may be appropriate in cases of extraordinary childhood abuse," especially when the defendant's "impairment [contributed] to the commission of the offense"); *see also United States v. Carter*, 506 F. Supp. 3d 1204, 1208-09 (M.D. Ala. 2020) (granting downward variance due to the "relationship between his offense and the trauma of his childhood"); *United States v. Harris*, 358 F. Supp. 3d 1202, 1203-04 (D. Colo. 2019) ("The appellate authority that makes clear, and as I have held on numerous occasions

in the course of sentencing scores of defendants, these historical characteristics of Mr. Harris, which include his physical abuse and trauma as a youth, … are legitimate grounds in and of themselves for a downward variance.”). !

A defendant’s age may also be a reason vary “downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.” U.S.S.G. § 5H1.1. Physical condition – such as one’s physical health or suffering from illness – may warrant a departure or variance “if the condition … individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.” U.S.S.G. § 5H1.4.

Furthermore, harsh conditions of pretrial confinement may also serve as a basis for a variance at sentencing. *United States v. Sutton*, 973 F Supp. 488, 493 (D.N.J. 1997), *aff’d* 156 F.3d 1226 (3d Cir. 1998) (“Unusual pretrial confinement … in either length or severity of condition, can properly be considered by the sentencing court.”); *United States v. Pacheco*, 67 F. Supp. 2d 495, 498 (E.D. Pa. 1999); *see also United States v. Pressley*, 345 F.3d 1205, 1218 (11th Cir. 2003) (“[C]onditions of confinement could provide a basis for departure, since this factor was apparently not taken into account by the Sentencing Commission and could be unusual enough to take a case out of the heartland of the applicable guideline.”); *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (same).

In the context of the COVID-19 pandemic, courts in this District have

varied below the Guidelines in numerous cases as a result of harsher presentence confinement conditions at the local jails contracted with the U.S. Marshals. *See, e.g.*, Statement of Reasons, *United States v. Hurt*, Case No. 17-cr-285 (NBF) (Nov. 6, 2020) (granting variance, in part, because defendant "served time during COVID-19 with protocols in place, making it more onerous and also restricted access to programming"); Statement of Reasons, *United States v. Stevens*, Case No. 18-cr-32 (NBF) (Nov. 5, 2020) (same); Sentencing Hr'g, *United States v. Reddix*, Case No. 19-376 (JFC) (Mar. 18, 2021) (granting variance, in part, because of "horrible conditions with the lock down" because of the "the inability to see loved ones [and] inability to have more frequent phone calls with family," as well as the lack of programming); Sentencing Hr'g, *United States v. Cox*, Case No. 18-cr-50 (DSC) (May 18, 2021) (granting variance, in part, based on the "limitations on [defendant's] liberty that prisoners normally have" in jail).

## III. APPLICATION OF SECTION 3553(a) FACTORS

Pursuant to Title 18, United States Code, Section 3553(a), a court, in determining the sentence to be imposed, must consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence imposed, (3) the kinds of sentences available, (4) the kinds of sentence and the sentencing range established under the Guidelines, (5) any pertinent policy statement under the Guidelines, (6) the need for unwarranted sentencing disparities, and (7) the need for restitution. 18 U.S.C. § 3553(a). This memorandum addresses the factors relevant to Mr. Moran's sentencing below.

**a. <u>Mr. Moran's History and Characteristics</u>**

i. <u>Childhood Abandonment, Upheaval and Sexual Abuse</u>

The PSR details Mr. Moran's sad and unstable childhood. For the first six years of his life, he was raised by his mother and father in Castle Shannon. His father was an alcoholic and he travelled frequently for work, and for long periods of time. When his father was home, his parents fought to the point of physical violence and abuse. At age 6, his parents divorced and he lived solely with his mother.

Living alone with his mother did not improve his childhood. She was verbally and physically abusive toward him, and she would frequently leave him with his uncle and aunt (the Nespojohny's). Mr. Moran recalls that when he was approximately 10 or 11, his mother exposed her breasts to him and instructed him to fondle her. Around the same time, Mr. Moran was sexually assaulted by a neighbor who forced Mr. Moran to perform oral sex on him. Shortly thereafter, his mother left permanently and he was forced to live with the Nespojohny's. A year later, when he was 12, he moved in with his aunt Leola in Castle Shannon. When he was 16, his recalls his father filed a complaint with CYS related to his aunt's care for him which resulted in his being placed in foster care in Elizabeth Township. A year later, he returned to his aunt Leola's home, where he resided until she passed away when he was 19. Both of his parents have since passed away and he has no siblings.

Mr. Moran graduated from Keystone Oaks High School in 1976. He remembers being bullied frequently and treated poorly by his teachers. He does not stay in touch with anyone from his youth.

ii. <u>Adult life and employment</u>

Since his aunt Leola died, Mr. Moran has lived alone as various homes in the region. He has never been in a romantic relationship. He describes his adult life as "quiet" and that he "keeps to himself." He has focused primarily on supporting himself. His only reported friend is Daniel Conway, an attorney he met while working at Rite Aid. Defense counsel conferred with Mr. Conway, who submitted a letter in connection with this memorandum. Letter from Daniel J. Conway ("Ex. A").

Mr. Moran has worked consistently throughout his adult life. From 1977 to 1981, he worked as a janitor for Oxford Development Corporation. From 1981 to 2000, he worked as a janitor for the Federal Reserve Bank of Pittsburgh, the last two years of which he also worked as a janitor at Keystone Oaks High School. From 2000 to his arrest, he worked as a janitor at St. Claire Hospital. For the 25 years prior to his arrest, he also worked part-time as a cashier at Rite Aid. Despite his long history of employment, Mr. Moran has not accumulated any wealth to speak of. Indeed, in 1993, he filed for bankruptcy.

Following his arrest in connection with the investigation of this case, Mr. Moran's vehicle was repossessed and his landlord discarded of all his belongings. He has nothing. Despite that, he has conducted himself well while in custody. A fellow

prisoner – Richard A. Murdock, Jr. – submitted a letter discussing the remorse Mr. Moran has expressed to him while in jail. He writes the following:

> Mike shared with me his troubled childhood. His parents were abusive mentally and sexually. He broke down in tears the day he opened up to me and without getting into details, it frankly was sad as well as disturbing. At 65 it still troubles him to this day. … Mike is sincerely sorry and remorseful for his actions. He made a mistake and terrible lapse in judgment. He frequently reflects on his sadness he experiences on what he's done.

Letter from Richard A. Murdock, Jr. ("Ex. B").

**b. <u>Nature and Circumstances of the Offense</u>**

The Probation Office summarized the offense conduct in paragraphs 8 to 19 of the PSR. Mr. Moran does not dispute the underlying facts as summarized and takes responsibility for his actions.

**c. <u>Sentencing Guidelines</u>**

i. <u>Technical Calculation</u>

Mr. Moran and the government both agree that the applicable Guideline range in this case is under Section 2G2.2. The presentence report – along with the addendum – calculates Mr. Moran's offense level as follows:

- 22 points – Base offense level (§ 2G2.2(a)(2))
- 2 points – Age/maturation of minor (§ 2G2.2(b)(2))
- 2 points – Distribution (§ 2G2.2(b)(3)(F))
- 4 points – Sadistic/masochistic content (§ 2G2.2(b)(4))
- 2 points – Use of computer (§ 2G2.2(b)(6))
- 5 points – Number of images exceeds 600 (§ 2G2.2(b)(7)(D))
- -3 points – Acceptance of Responsibility reduction (§ 3E1.1(a)-(b))
- **TOTAL = 34 points**

At Criminal History Category I, Mr. Moran's advisory Guideline range is 151 to 188 months. Before this case, Mr. Moran had never been charged with a criminal

offense, let alone he had never served a term of incarceration. Notwithstanding his lack of criminal history, the Sentencing Commission recommends a sentence of 12.5 to 15.5 years of incarceration.

For the reasons that follow, the Court should vary downward 4 levels and find that the appropriate total offense score is 30, adjusting his advisory Guideline range to 97 to 121 months.

ii. <u>The child pornography guideline is not the product of empirical research and should be afforded less deference</u>

The child pornography Guideline has been substantively amended nine times since 1987 and Congress has been "particularly active" in that process, forcing the Sentencing Commission to be "constantly reacting to Congress's repeated directives." *United States v. Grober*, 624 F.3d 592, 604-05 (3d Cir. 2010). An advisory Guideline represents a "rough approximation of sentences that might achieve § 3553(a)'s objectives only when it is the product of empirical data and national experience, guided by a professional staff with appropriate experience." *United States v. Arrelucea-Zamudio*, 581 F.3d 142,155 n.12 (3d Cir. 2009) (internal citations omitted). The history of Section 2G2.2 and Congress's role in that process, however, demonstrates "a 'blatant' disregard for the Commission and the 'the most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress….'" *United States v. Dorvee*, 616 F.3d 174, 184-85 (2d Cir. 2010) (citing Alan Vinegrad, The New Federal Sentencing Law, 15 Fed. Sent. R. 310, 315 (June 2003)); *see also Grober*, 624 F.3d at 608 ("…§ 2G2.2 was not developed pursuant to the

Commission's institutional role and based on empirical data and national experience, but instead was developed largely pursuant to congressional directives"). Section 2G2.2 is therefore "fundamentally different from most [Guidelines] and … unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Dorvee*, 616 F.3d at 184.

District courts and courts of appeals around the country have found that Section 2G2.2 is fundamentally flawed and is therefore entitled to less deference and reliance than other Guidelines. *See, e.g.*, *Grober*, 624 F.3d at 603 (collecting cases "across the country [finding] § 2G2.2 flawed"); *United States v. McElheney*, 630 F. Supp. 2d 886, 901 (E.D. Tenn. 2009) ("[I]n light of the institutional deficiencies in the child pornography Guidelines, the Court gives them less deference than empirically grounded Guidelines."); *United States v. Jacob*, 631 F. Supp. 2d 1099, 1112 (N.D. Iowa 2009) ("§ 2G2.2 should be categorically rejected, on policy grounds"); *United States v. Schinbeckler*, 2011 WL 4537907, at *4 (N.D. Ind. Sept. 29, 2011) (*citing United States v. Huffstatler,* 571 F.3d 620, 622–23 (7th Cir.2009)) (the "child pornography Guidelines do not deserve the same weight inherent in other guidelines because they did not result from careful study based in empirical analysis and national experience, but are the result of congressional mandates").

But simply stating that the child pornography Guidelines deviated from the typical reasoned approach by the Sentencing Commission only identifies a flaw in the process. The ramifications of that flawed process have led to the present-day

debacle where the Guideline has lost its fundamental purpose: to guide courts to sentence offenders in accordance with their relative culpability. It is not altogether surprising that a Guideline formulated through congressional meddling motivated by emotional (*i.e.*, political) aversion to the underlying offense has outstripped the deterrent effects typically sought by courts. At least one court has expressed serious doubts about the effect increased penalties for consumers of child pornography has had on the abuse of children generally and the continued production and distribution of child pornography. *United States v. Kelly*, 868 F. Supp. 2d 1202, 1207 (D.N.M. 2012) ("To the contrary, while prosecutions of child pornography have skyrocketed, prosecutions of actual sexual abuse of children have remained constant.").

For the foregoing reasons, as many courts across the country have already done so, this Court should afford the child pornography Guideline less deference.

iii. Enhancements for use of computer and number of images constitute double counting

Separate and apart from the flawed process formulating the present incarnation of Section 2G2.2, several enhancements in that Guideline effectively penalize an offender for essentially the same conduct. Possession of child pornography has become an internet crime, and the typical means of committing that offense result in the application of enhancements in virtually every case. In the standard case, an offender downloads software that enables him to download single folders that contain hundreds or thousands of photographs and videos of child

pornography. In one click, a defendant can subject himself to an enhancement of 7 points (use of computer and 600+ images).

Most of the enhancements in § 2G2.2 were promulgated before universal personal access to the Internet existed and when the typical offender obtained child pornography in printed form in the mail. U.S. Sentencing Comm'n, *Federal Child Pornography Offenses* (Dec. 2012), at ii-iii, *available at* http://www.ussc. gov/Legislative-and-Public-Affairs/ Congressional–Testimony–and–Reports/Sex–Offense–Topics/201212–Federal–Child–Pornography–Offenses/ (hereinafter "Commission Report"). Enhancements for use of a computer and number of images originally were therefore promulgated before ready access to the internet and peer-to-peer file-sharing programs when such factors better served to distinguish among offenders. *Id.* "These technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography," and "[a]s a result of such changes, entry-level offenders now easily can acquire and distribute large quantities of child pornography at little or no financial cost and often in an anonymous, indiscriminate manner." *Id.* at 312-13 (footnote omitted).

To put the numbers in perspective, in 2022, in all cases in which Section 2G2.2 was applicable (a total of 1,514 cases), the use of computer enhancement was applied in 96.6% of the cases, and the number of images enhancement was applied in 94.8% of the cases (72.5% receiving a 5-level enhancement for greater than 600 images). *See* U.S. Sentencing Comm'n, *Use of Guidelines and Specific Offense Characteristics* at 98-99 (2022), *available at* https://www.ussc.gov/sites/default/files/

pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2022/Ch2_Guideline_FY22.pdf

Chief Judge Hornak has identified this problem with Section 2G2.2 and previously ruled that applying both the use-of-computer enhancement and the number-of-images enhancement – at least based on the facts of previous cases – effectively constitutes double-counting. *See, e.g.*, Tentative Findings and Conclusions at 4, *United States v. Leneweaver*, 14-cr-175 (W.D. Pa. Oct. 9, 2015) ("The Court notes that in the factual circumstances of this case as reflected in the PSI and plea hearing record, the Court believes that applying the 'use of computer' enhancement along with the 'number of images' enhancement in this case result in a material form of impermissible 'double counting' in that as a practical and factual matter, there is an essential overlap as to the number of images and use of a computer."). The Court should make the same finding here.

iv. Enhancements under Section 2G2.2 are fundamentally punitive in nature and do not reflect relative culpability

Specific offense characteristic enhancements "are meant to increase a sentence for conduct more aggravated than the typical type of offense." *United States v. Robinson*, 669 F.3d 767, 778 (6th Cir. 2012). The Sentencing Commission explains that "guidelines take account of a number of important, commonly occurring real offense elements such as the presence of a gun, or the amount of money actually taken, through alternative base offense levels, specific offense characteristics, cross references, and adjustments." United States Sentencing Commission Guidelines Manual at 6 (Nov. 1, 2023). When enhancements under a

Guideline cease to reflect the relative culpability of the offender, they are dubious and should be carefully scrutinized. It is for that reason that the Sentencing Commission recommended that the enhancement under Section 2G2.2 be amended to "'better reflect the current spectrum of offender culpability." Commission Report at xviii. The Department of Justice agreed, stating that "the existing Specific Offense Characteristics ('SOCs') in USSG [Section] 2G2.2 may not accurately reflect the seriousness of an offender's conduct, nor fairly account for differing degrees of offender dangerousness." Department of Justice Letter to the USSC on the Child Pornography Report at 1 (March 5, 2013), *available at* http://fsr.ucpress.edu/content/25/5/345.

In *Grober*, the District Court came to the same conclusion. 624 F.3d at 597 ("The District Court discussed … reasons why it believed § 2G2.2 to be flawed … [including] that most of the enhancements are essentially inherent in the crime and, thus, apply in nearly every case."); *see also Dorvee*, 616 F.3d at 186 ("An ordinary first-time offender is therefore likely to qualify for a sentence of at least 168-210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancement that are all but inherent to the crime of conviction."); *United States v. R.V.*, 157 F. Supp. 3d 207, 211 (E.D.N.Y. 2016) ("Several of the Commission's relevant sentencing enhancements tend to apply indiscriminately to all child pornography offenders, greatly increasing the recommended punishment range without reflecting an individual's heightened level of culpability.").

Three such enhancements appear in virtually all cases: age of minor depicted, use of computer,[1] and number of images[2].

**Table 1: Use of Specific Offense Characteristics in 2G2.2 from 2018-2022[3]**

| Year | Age/ maturation | Computer | Number of Images (any enhancement) | Number of Images (600+) |
|---|---|---|---|---|
| 2018 | 94.1% | 96.6% | 95.7% | 76.7% |
| 2019 | 94.3% | 95.8% | 94.9% | 75.6% |
| 2020 | 93.6% | 94.2% | 93.6% | 73.0% |
| 2021 | 94.5% | 96.1% | 94.2% | 73.2% |
| 2022 | 93.4% | 96.6% | 94.8% | 72.5% |

[1] When it was first proposed, the use-of-computer enhancement was justified by Senator Orrin Hatch because it would help law enforcement "keep pace with changing technology" and would ensure "that [the information super] highway is not littered with the debris of child pornography." 141 Cong. Rec. S5509-02 (Apr. 6, 1995). Today, in light of the effect the internet has had on the means that people obtain child pornography, the enhancement is virtually meaningless with respect to relative culpability and serves no other purpose than to increase the advisory Guideline range. As one court so eloquently explained, the enhancement for use of computer in a child pornography is akin to penalizing speeding, "but then adding an additional penalty if a car is involved." *United States v. Kelly*, 868 F. Supp. 2d 1202, 1209 (D.N.M. 2012) (citation omitted).

[2] Several Guidelines adjust the offense score based on amounts of certain illegal conduct – drug quantities under § 2D1.1, amount of loss in § 2B1.1, number of firearms in § 2K2.1 – because the extent and degree of criminal conduct bears a relationship to such quantifiable measurements. *Id.* Yet, in light of the ease with which an offender may acquire greater than 600 images – especially considering the arbitrary way in which the Guideline commentary assigns 75 images for every video seized – many courts have expressed serious doubt as to the relationship between the number of images and the culpability of the defendant. *E.g.*, *Robinson*, 669 F.3d at 778 ("In the computer age, we have some doubt that the number of pictures alone captures the gravity of the crime of possession of child pornography.").

[3] United States Sentencing Commission, Data Reports by Guideline, *available at* http://www.ussc.gov/research/data-reports/guideline.

The near ubiquitous nature of these sentencing enhancements is significant because – beyond the concerns of double-counting – the child pornography Guideline causes courts to violate the requirements of Section 3553(a) because the Guideline itself runs roughshod over the nature and circumstances of specific defendant's offense and his history and characteristics. *Dorvee*, 616 F.3d at 187 (Section 2G2.2 "eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider "the nature and circumstances of the offense and the history and characteristics of the defendant' and violates the principle, reinforced in *Gall,* that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct."). Reflexively applying the enhancements under Section 2G2.2 is "is fundamentally incompatible with § 3553(a)" because it "results in virtually no distinction between the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories." *Id.*; *see also United States v. Schinbeckler*, 2011 WL 4537907, at *5 (N.D. Ind. Sept. 29, 2011).

There is now a growing trend of downward variances in child pornography cases as a result of the unreliable and punitive Guideline regime under Section 2G2.2. In 2022 alone, courts around the country varied from the Section 2G2.2 Guideline in 55.6% of the time, and the average sentencing reduction was 40.2%. U.S. Sentencing Comm'n, Quick Facts – Child Pornography Offenders (2022), *available at*, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Child_Pornography_FY22.pdf (last visited July 5, 2023).

The trend of variances is not surprising in light of the Sentencing Commission's 2010 survey of district court judges that revealed that 70% believe the child pornography Guideline for possession offenses is too high. United States Sentencing Commission, *Results of Survey of United States District Judges January 2010 through March 2010* (June 2010), *available at* http://www.ussc.gov/Research/Research_Projects/projects.cfm. Accordingly, Mr. Moran asks this Court to make the same or similar finding.

v. Mr. Moran's offense score is flawed and does not reflect his relative culpability

As explained above, Mr. Moran's conduct makes applicable enhancements for age of the depicted minor, use of a computer, and number of images. A total of 9 points are added to his total offense score because of those enhancements. Those enhancements do not reflect his relative culpability – especially in light of the already-enhanced base offense level in distribution cases – and therefore they should be reduced. Mr. Moran proposes that his offense level be reduced by a total of 4 points, bringing his total offense score to 30.

Mr. Moran's offense of conviction is not outside the norm, yet the Guidelines dictate that he is the ultimate offender that warrants the full force of retribution and deterrence for his actions. But let us call a spade a spade; the child pornography Guideline adopts the incapacitation model alone and applying it to a non-aggravated distribution case results in a sentence that is unreasonable. The emotions surrounding child pornography cases offenses are real, and they hit home for all involved in the criminal justice adjudicatory process. But the Guidelines were

created to avoid emotional decisions, and only those enhancements that are subject to empirical research and national experience should be accorded due consideration.

## IV. MR. MORAN SHOULD RECEIVE A VARIANCE BECAUSE OF THE CLOSE RELATIONSHIP BETWEEN HIS CHILDHOOD ABUSE AND HIS OFFENSE CONDUCT

All trauma can have a profound impact on an individual. But when sexual abuse is inflicted on a child, and done so by one's own mother and neighbor on separate occasions, then the effect of that sexual abuse can and very likely will pervade all aspects of that child's present and future life. It is abundantly evident that it did for Mr. Moran. He reported the abuse to the Probation Office and detailed the lonely and isolated life he lived thereafter. Undersigned counsel has not represented any individual who has been as abandoned and without family or community support as Mr. Moran. Put simply, factors outside Mr. Moran's control when he was 10 or 11 years old set him on a trajectory to lead a sad, lonely, and dysfunctional life.

Although it does not constitute an excuse for his actions, the abuse that Mr. Moran suffered puts his offense in a larger context. At the very least it offers an explanation why this happened. It does not strain the imagination to figure out why Mr. Moran – who was sexually assaulted by his mother and neighbor within a short period of time when he was 10 or 11 years old – reported to agents that he seeks out images involving male between the ages of 10 or 11. PSR at 15. His behavior in this case is a fairly transparent (albeit illegal) attempt to cope with his own abuse.

Beyond the question of why this happened, Mr. Moran's past abuse mitigates his culpability in this case. It is gut wrenching to think about how Mr. Moran was sexually assault by his own mother, who then abandoned him shortly thereafter. Then, in the aftermath of the upheaval caused by his mother's abandonment, he moves in with his uncle and aunt and is sexually assaulted by a neighbor. The utter instability and victimization that happened to Mr. Moran on the cusp of going through puberty himself must have been devastating. Given the childhood abuse he suffered and the close relationship between that abuse and his offense conduct in this case, a further variance from the new advisory Guideline range is warranted.

## V. MR. MORAN SHOULD RECEIVE A VARIANCE BECAUSE OF HIS AGE AND HEALTH

At the time of his sentencing, Mr. Moran will be 66 years old. He is being treated for high blood pressure and high cholesterol. He has cataracts in his eyes. At 5-foot-9-inches and weighing 197 pounds, his body mass index of 29.1 qualifies as "overweight" and he falls just short of obesity at 30.0. *See* Adult BMI Calculator, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited March 22, 2024). What is readily apparent from seeing Mr. Moran face-to-face, however, is his significant dental health issues. Consistent with his report to the Probation Office, he has a limited number of teeth remaining after undergoing dental surgery while housed at Allegheny County Jail in late 2022. While Mr. Moran is not suffering from chronic disease, the conditions he has are consistent with an individual who is aging and will require more extensive and

frequent medical treatment. The Guidelines contemplate a sentence that will incarcerate Mr. Moran into his mid- to late-seventies.

In May 2015, the United States Department of Justice published the following conclusions about the impact of aging inmates on the Federal Bureau of Prisons:

- Aging inmates are more costly to incarcerate, primarily due to their medical needs.
- BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose.
- The physical infrastructure of BOP institutions cannot adequately house aging inmates.
- The BOP does not provide programming opportunities specifically addressing the needs of aging inmates.

Office of the Inspector General, U.S. Dep't of Justice, *Impact of an Aging Inmate Population on the Federal Bureau of Prisons* at Table of Contents (May 2015), *available at* https://oig.justice.gov/reports/2015/e1505.pdf. The DOJ report is consistent with more recent findings that incarceration actually shortens an individual's life expectancy. Emily Widra, Prison Policy Initiative (June 26, 2017), *available at* https://www.prisonpolicy.org/blog/2017/06/26/life_expectancy/ (last visited March 22, 2024). Most recently, the Washington Post reported on a slew of studies detailing the shortcomings of the prison system in meeting prisoners' health needs. Hope Corrigan, *My dad was ill. Could he survive the prison health-care system?*, Wash. Post (Jan. 27, 2024), *available at* https://www.washingtonpost.com/health/2024/01/27/prison-health-care-fears-risks/. In particular, the Washington Post makes the following observations:

> Meanwhile, the Centers for Disease Control and Prevention notes that incarcerated people have higher rates of several chronic conditions, including HIV, hepatitis B and tuberculosis. Substance use and mental health disorders are also disproportionately high among prison populations, according to numerous sources. Yet a 2023 study from the Johns Hopkins Bloomberg School of Public Health reported that, "for many common and serious conditions, incarcerated people are substantially less likely to be treated compared to the general U.S. population."

*Id.*

The inability of the BOP to meet the needs of an aging prisoner is clearly demonstrated in how it was unable to effectively respond to the COVID-19 pandemic. For example, during the pandemic, the COVID-19 infection rate across all prison populations through the end of February 2021 was 228 prisoners per 100,000. In the BOP, however, the number was 298 prisoners per 100,000. Dep't of Justice Special Report, Impact of COVID-19 on State and Federal Prisons, March 2020-Feburary 2021 (Aug. 2022), *available at* https://bjs.ojp.gov/content/pub/pdf/icsfp2021.pdf. Numerous reports have detailed how prison populations were infected at higher rates and suffered more adverse consequences during the pandemic. *See, e.g.*, Miltonette Olivia Craig, et. al, *Incarcerated in a Pandemic: How COVID-19 Exacerbated the "Pains of Imprisonment"*, NIH Criminal Justice Review (2023), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10375228/pdf/10.1177_07340168231190467.pdf (estimating that deaths due to COVID-19 were ***six times higher*** in prisons than in general population).

As cited above, the Court may consider Mr. Moran's age and health in fashioning an appropriate sentence. In light of Mr. Moran's advanced age and health issues – which, he concedes, does not warrant a formal downward departure

– a downward variance is warranted. This is even more appropriate given the nature of the offense of conviction, and the fact that a sentence well below the advisory Guideline range would still result in Mr. Moran's release when the drive to commit a similar offense will very likely no longer exist.

## VI. MR. MORAN SHOULD RECEIVE A DOWNWARD VARIANCE BASED ON THE UNUSUALLY HARSH CONDITIONS OF HIS PRETRIAL CONFINEMENT

Mr. Moran has been in continuous custody since October 24, 2018. That is 53 months. He spent the first portion of that time at ACJ, then Butler, and now NEOCC. He spent the entirety of the COVID-19 pandemic – and the aftermath that we are still enduring – in custody. The pandemic forced the jails to suspend inmates' regular access to basic amenities, as well as much needed individualized programming and therapy groups, in order to stem the spread of the virus within its walls.

First, throughout 2020, 2021 and 2022, access to in-person visitation was limited to prevent the spread of infection. Although visitation has been normalized recently, it is subject to limitation during the frequent lock-downs due to the virus. Second, inmate programming was and continues to be drastically curtailed. This means no men's group, no group therapy sessions, no congregating to discuss and relate difficult traumas and barriers to opportunity with others with similar life backgrounds. While it is understandable that such services be altered in the midst of a deadly pandemic, the lack of such support groups undoubtedly affects the nature of the prisoner's time in custody in a negative manner. Third, inmate

recreational time was severely limited, with prisoners relegated to a maximum of one hour a day out of their cell – commonly referred to as 23 and 1. And fourth, mental health therapeutic programming was and continues to be severely limited.

Put together, Mr. Moran's presentence custody in this case has been far harsher than what is typical for a defendant in this District in non-pandemic times. He has been kept from seeing visitors, he has had little to no access to inmate programming, his recreational time has been drastically curtailed, his access to phones likewise has been limited, and the jail has struggled to provide regular mental health treatment to its inmates since the pandemic began. Custody is a restriction of liberty in order to achieve the four pillars of our criminal justice system (retribution, deterrence, incapacitation, and rehabilitation). But when that term of custody is more onerous and restrictive than what is typically experienced by the average prisoner – in normal non-pandemic times – that punishment is incrementally harder to bear. Accordingly, the Court should recognize the harsh conditions in which Mr. Moran has been confined during the last nearly four and a half years and grant a further variance from the advisory Guideline range.

## VII. CONCLUSION

Because Mr. Moran past childhood abuse, the fundamental flaws in the child pornography Guideline, his advanced age and physical health issues, and the unusually harsh condition of his pretrial confinement, a sentence between 78 and 97 months followed by an extended term of supervised release will be sufficient but not greater than necessary to comply with the purposes of sentencing.

Respectfully submitted,

**/s/ Andrew Lipson**____________

ANDREW LIPSON
Assistant Federal Defender
Western District of Pennsylvania
1500 Liberty Center
1001 Liberty Avenue
Pittsburgh, PA. 15222-3714
Main: 412-644-6565
Fax: 412-644-4594
E-mail: andrew_lipson@fd.org